IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| JOHN R. HAYES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-CV-090 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. On appeal, plaintiff argues that an alleged treating physician's assessment was not sufficiently considered below.

Having reviewed the administrative record and the parties' briefing, the court deems harmless any purported error relating to the physician's opinion. For that reason, defendant's motion for summary judgment [doc. 18] will be granted, and plaintiff's motion for judgment on the pleadings [doc. 14] will be denied. The final decision of the Commissioner will be affirmed.

# I.

## *Procedural History*

Plaintiff filed the present application for benefits in February 2008, alleging a disability onset date of July 1, 2005. [Tr. 99]. That date was subsequently amended to February 1, 2008. [Tr. 18-19]. Plaintiff claims to be disabled by an aortic aneurism, back pain, and breathing impairments. [Tr. 114]. His current application was denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") in March 2009.

In June 2009, the ALJ issued a decision denying benefits. He concluded that plaintiff suffers from "thoracoabdominal aneurysm, lower back pain that radiates into the right leg with spasms, depression, asthma and opioid dependence," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 10-11]. The ALJ found that plaintiff retains the residual functional capacity ("RFC") for a range of light exertion. [Tr. 12]. The ALJ also found plaintiff's credibility to be diminished by evidence "suggest[ing] he may be exaggerating symptoms in an effort to obtain drugs." [Tr. 13]. Relying on vocational expert testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the regional and national economies. [Tr. 14]. Plaintiff was therefore found ineligible for benefits.

Plaintiff then sought review from the Commissioner's Appeals Council. On January 26, 2010, review was denied. The ALJ's ruling therefore became the Commissioner's final decision. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical

3

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *Walters*, 127 F.3d at

529. The burden shifts to the Commissioner at step five. *Id*.

III.

*Analysis*

On appeal, plaintiff argues that the ALJ committed reversible error by failing to explain the rejection of (or even discuss) an assessment by a purported treating physician, Dr. Philip Meyette. That is the single issue raised on appeal, and all other arguments are deemed waived. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006).

The opinions of treating physicians are entitled to great weight when supported by sufficient clinical findings consistent with the evidence. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). The reasoning behind this rule is that a treating physician, by virtue of an ongoing treatment relationship, is presumed to have a greater insight into the claimant's true condition and thus is able to provide a more accurate assessment of the claimant's abilities and limitations. *See Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992); 20 C.F.R. § 416.927(d)(2). Relevant factors in evaluating a treating source's opinion include the length and nature of the treating relationship, as well as the supportability of the opinion. *See* 20 C.F.R. § 416.927(d)(2)-(3).

A. Background

On February 9, 2006, plaintiff filed a prior application for benefits, telling the Commissioner that he was unable to work. [Tr. 93]. However, to St. Mary's Pain Management Center in July through November of 2007, plaintiff reported leisure activities

including working around the house, playing guitar, traveling, and fishing. [Tr. 390, 393, 397, 400, 403].[1] In forms submitted to the Commissioner in March 2008, plaintiff represented: "I can't sit or stand but just a few minutes at a time" [Tr. 125]; "I don't [have any daily activities] and am not able to do much but get up - get dressed and stay at the house all day" [Tr. 126]; and that he is no longer able to engage in any activities or hobbies other than watching television. [Tr. 130]. However, less than three months prior, a medical source had written that plaintiff had been "very active for the holidays. [N]o difficulty with function." [Tr. 347].

Plaintiff characterizes Dr. Meyette as a "treating physician." Dr. Meyette is one of a series of doctors who have prescribed narcotics to plaintiff in response to his complaints of pain. As with St. Mary's, a number of these physicians - *including Dr. Meyette* - eventually discharged plaintiff from their care due to his drug-seeking behavior.

For example, plaintiff first visited Knoxville Orthopaedic Clinic ("KOC") in July 2004 and he returned in August and September 2005. In light of a diagnosis of "mild disc protrusions" and lumbar tenderness, Dr. Bruce Fry recommended a facet joint injection. [Tr. 251, 253]. Dr. Fry also provided hydrocodone prescriptions at the 2005 appointments. [Tr. 249, 251]. However, on October 7, 2005, Dr. Fry wrote that plaintiff "has broken pain medication contract and he [sic] will no longer prescribed [sic] opioids for him." [Tr. 248].

---

[1] By February 2008, plaintiff had been dismissed by St. Mary's for numerous violations of his medication agreement, including seeking prescriptions from three other providers and twice claiming that his medication had been stolen. [Tr. 361-63].

The record does not indicate that plaintiff ever returned to KOC to receive the recommended non-narcotic injection treatment. [Tr. 247].

On November 24, 2004, pulmonologist William Cole wrote,

> The patient was prescribed Tylenol #3. We will discontinue this. The patient has had multiple narcotics prescribed and seems to likely have an addiction to narcotics and does bring into question whether his pleuritic chest pain is actually real or narcotic seeking behavior as well as with his cough. Plan to discuss the number of narcotic pain killers that he has received in such a brief period of time and if he is getting it from multiple physicians, so we are able to chart no narcotics.

[Tr. 675-76]. The record reflects no further appointments with Dr. Cole.[2]

Plaintiff was referred to neurologist Jeffrey Nelson in August 2006. Dr. Nelson prescribed a muscle relaxant, two different narcotic pills, and a narcotic patch. [Tr. 305-08, 310-13]. Plaintiff reported more than once that he ran out of his patches early because they would fall off as he worked. [Tr. 308, 310-12]. He also requested higher dosages of medication due to reported breakthrough pain. [Tr. 309]. After discovering that plaintiff was also obtaining narcotic patch prescriptions from another physician, Dr. Nelson wrote to him on March 26, 2007, stating, "I have lost my trust in your ability to take narcotics appropriately as I have prescribed, and I must terminate your relationship with this office." [Tr. 303-04]. Dr. Nelson offered to "recommend narcotic addiction services." [Tr. 303].

The administrative record shows five visits to All About You Family Medicine between September and December 2007. To physician's assistant Hector Vega, plaintiff

---

[2] Plaintiff continued to work full-time into at least 2005, "climb[ing] ladders all day," "crawl[ing] under houses," and carrying a 23-pound tool belt. [Tr. 115].

7

reported increasing back pain. He sought, and received, narcotic refills. [Tr. 347-56]. On January 9, 2008, Mr. Vega discharged plaintiff from his practice for "using several providers to obtain pain meds." [Tr. 346].

In October 2008, plaintiff made his initial visit to Dr. Douglas Marlow and was given prescriptions for Roxicodone and OxyContin. [Tr. 608-09]. Within two weeks, plaintiff had returned to Dr. Marlow seeking an early refill of his Roxicodones because "he stated he spilled the remainder of his medication down the drain by mistake." [Tr. 606]. Incredibly, plaintiff was given a prescription for 120 more Roxicodones as requested. [Tr. 606].

The record reflects no further appointments with Dr. Marlow, but plaintiff appeared at the office of Dr. Carrie Ellis one month after "spilling [his Roxicodones] down the drain by mistake." Plaintiff misinformed Dr. Ellis that he had not had a primary care physician "in a couple of years." [Tr. 627]. Dr. Ellis gave plaintiff two narcotic prescriptions "until he can get into a pain clinic." [Tr. 628-29]. Over the next two and a half months, plaintiff gave Dr. Ellis reasons why he had not yet been to a pain clinic [Tr. 621-26], and Dr. Ellis would refill his narcotic prescriptions. [Tr. 622, 624, 626]. On January 19, 2009, plaintiff sought an early medication refill "because his 3 year old son accidentally knocked over the bottle, so he lost several pills." [Tr. 621]. Dr. Ellis "agreed to refill his pain medication early and give 2 weeks after his son spilled the bottle. [H]e is aware that this is the only time I will do this." [Tr. 622]. The record reflects no further appointments with

8

Dr. Ellis.

The above-cited episodes are nothing new. As early as February 1994, neurosurgeon William Tyler recommended an exploration and nerve release in response to plaintiff's complaints of arm, neck, shoulder, and head pain. [Tr. 298]. Dr. Tyler provided a Percocet prescription. The following month, he wrote,

> Mr. Hayes failed to keep his appointment today to discuss the exploration of the superficial radial nerve in the forearm. Since his last visit here he has called multiple times for analgesic medication. He put off the surgery for what seemed to be an inordinate period of time if the pain was as severe as he claimed it was. It seems that when it came down to the time of surgery he electively had ceased treatment, making one at least question whether the main motivation he had was to obtain drugs rather than treatment of his problem.

[Tr. 297]. Six days later, plaintiff called to assure Dr. Tyler's staff that he was "ready for surgery" and he made an appointment to return in two weeks to discuss the procedure. [Tr. 297]. Plaintiff was nonetheless told by Dr. Tyler's staff that no further narcotics would be prescribed. [Tr. 297]. Plaintiff was then a "no show" for all future appointments with Dr. Tyler. [Tr. 297].

In February 2006, plaintiff was admitted to Baptist Hospital for detoxification. Dr. Eric Peterson noted "his addition [sic] to opiates escalating to the point of 300-400 mg of pills and morphine suckers to a cost of $300 per week." [Tr. 340]. Dr. Peterson further noted "all of the attendant lying, covering, cheating, etc." [Tr. 340]. Plaintiff reported spending 21 months in federal prison in the late 1990s for forging prescriptions. [Tr. 340].[3]

---

[3] Plaintiff told an entirely different story to the ALJ while under oath at his administrative
(continued...)

Plaintiff was again admitted to Baptist Hospital for detoxification in March 2007, following his discharge from Dr. Nelson's care. Attending physician Vijay Jethanandani wrote, "His neurologist finally stopped writing the prescriptions because of his drug abuse. He said sometimes he was using up to 5 patches at the same time." [Tr. 334].

Plaintiff was admitted to Baptist Hospital again in January 2008 because, in his words, "I got hooked on those pain pills again." [Tr. 328]. Attending physician Joseph Kennedy wrote that plaintiff,

> with a history of opioid dependence that dates back from the 1980s, presented to the hospital requesting detox from opioids. The patient has been taking 10 to 15 oxycodone and around 200 mg of OxyContin on a daily basis. He states that when he was here at Baptist, last about a year ago, he relapsed on the way home. . . . The patient has been going to a pain clinic, but he states he has also been buying some pills on the street. He does have a history of legal issues related to forging prescriptions and tends to focus more on his pain as the reason for his drug use, but he does have a longstanding history of drug dependence.

[Tr. 328]. Plaintiff left the hospital three days later "against medical advice." [Tr. 326]. Dr. Kennedy wrote that "it did not appear that he was terribly committed to treatment." [Tr. 326-27].

### B. Dr. Meyette

In the context of the above-cited medical history, the court turns its review to the records of Dr. Meyette. Plaintiff first appeared at Dr. Meyette's office on April 30, 2008.

---

[3](...continued)
hearing: "It was a drug possession charge. I had driven a car for a friend from Texas and it turns out there were drugs in the car." [Tr. 23].

[Tr. 560]. Plaintiff denied illegal drug use. [Tr. 560]. He sought, in part, narcotic prescriptions [Tr. 560-61] and within five days Dr. Meyette had begun writing them. [Tr. 558]. The relationship continued until September 2008, when plaintiff was discharged after being arrested for altering one of Dr. Meyette's prescriptions. [Tr. 586, 597, 599].[4]

After having seen plaintiff on four occasions (and after having recently written "Daytime function great"), Dr. Meyette completed a "Treating Relationship Inquiry" form on June 13, 2008. It is in regard to this assessment form that plaintiff contends the ALJ committed reversible error. Dr. Meyette opined that plaintiff could not be expected to consistently complete a 40-hour work week because his back causes "problems walking, sitting and standing." [Tr. 568]. Dr. Meyette was, however, "not sure" how many hours per day plaintiff is actually capable of sitting, standing, and walking [Tr. 568], and he was "unable to evaluate" all questions pertaining to lifting, postural movement, and environmental restrictions. [Tr. 569-70]. Dr. Meyette further opined that plaintiff should not lift more than 25 pounds and that he would need "[f]requent breaks to relieve back pain." [Tr. 570-71]. Less than three weeks after this assessment, plaintiff told Dr. Meyette that he was "[g]oing to build a new house" and that he was going to Florida for a multi-week

---

[4] At a final "emergency visit" on October 1, 2008, Dr. Meyette wrote, "The patient states that he got arrested for having filled his [blood pressure] prescription and does not know how the other narcotic medication got added on to the other prescription. . . . His pain management may need to be overseen by a pain management specialist." [Tr. 586].

11

vacation. [Tr. 592].[5]

The ALJ's written decision contains no mention of Dr. Meyette's opinion. Presuming that the ALJ erred in not addressing the assessment, the court finds the error to be harmless.

An administrative decision should generally not be reversed and remanded where doing so would be merely "an idle and useless formality." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citation omitted). At the same time, a reviewing court cannot find an error to be harmless solely because the claimant "appears to have had little chance of success on the merits anyway." *Id.* at 546 (citation omitted). Instead, the court must be able to discern at least *some* indirect support for the challenged rejection of a pertinent opinion, such as:

> 1. The medical opinion was so patently deficient that no reasonable fact-finder could have credited it;
>
> 2. The ALJ elsewhere adopted the opinion;
>
> 3. An earlier decision by the ALJ adequately addressed the issue; or
>
> 4. The ALJ's reasoning could be inferred from his overall discussion of the condition.

*Id.* at 547; *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462-66 (6th Cir. 2005).

---

[5] The court takes judicial notice of the fact that plaintiff would have traveled from Tennessee to Florida either by car or by plane, with either mode being far more than a fifteen-minute journey. Curiously, in an undated Disability Report form, plaintiff told the Commissioner, "I cannot sit in a car for long periods because the pain is so bad." [Tr. 114]. Under oath at his administrative hearing, plaintiff similarly testified that he cannot sit or stand for more than ten or fifteen minutes due to back pain. [Tr. 24].

12

A significant component of Dr. Meyette's opinion, that plaintiff should not lift more than 25 pounds, was "elsewhere adopted" by the ALJ in restricting plaintiff to no more than light work. More fundamentally, however, Dr. Meyette's opinion "was so patently deficient that no reasonable fact-finder could have credited it." The opinion was offered after a brief treating relationship. Plaintiff by that point had misled the physician regarding his illegal drug use - conduct that, as noted, another source had described as "lying, covering, cheating, etc." Shortly before opining that plaintiff was disabled, Dr. Meyette had described daytime functioning as "great." Shortly after opining that plaintiff was disabled, Dr. Meyette learned that plaintiff planned to build a house and take a multi-week vacation to Florida. Not long after, Dr. Meyette discharged plaintiff for prescription fraud.

Quite plainly, at the time of his vocational assessment, Dr. Meyette's treatment of plaintiff lacked the longevity and substance ideally seen in a treating physician relationship. *See* 20 C.F.R. § 416.927(d)(2)(i)-(ii). Plaintiff had already misled Dr. Meyette by telling him that he is not an illegal drug user. There is no reason to think that plaintiff was not again using his subjective complaints as a way of obtaining narcotics, as was done with physicians before and after Dr. Meyette. Further, Dr. Meyette's opinion lacked supportability, *see* 20 C.F.R. § 416.927(d)(3), as that physician's records elsewhere indicate "great" daytime functioning and the capacity to both build a house and travel to Florida. Dr. Meyette's assessment was also highly equivocal in the number of "not sure" and "unable to evaluate" answers provided therein. These considerations, and plaintiff's eventual dismissal

13

for prescription fraud, do not form the basis for a treating physician opinion that *any* reasonable adjudicator would credit. The ALJ's failure to discuss Dr. Meyette's assessment was therefore, at most, harmless error.

In closing, the court is compelled to briefly address plaintiff's accusation [doc. 15, p.7] that, in citing evidence of drug-seeking behavior, the ALJ was "using . . . tactics to try and discredit" him. Plaintiff's accusation is misplaced and inappropriate. The ALJ's conclusion regarding plaintiff's conduct and its impact on his credibility was not a "tactic." Instead, the issue was relevant and abundantly supported by substantial evidence of record.

The final decision of the Commissioner will be affirmed, and an order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan
United States District Judge